UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
DeCoro USA, Limited,            )      Case No. 09-10846C-11G
                                )
          Debtor.               )

MEMORANDUM OPINION

This case came before the court on September 23-24, 2013 for trial in which the Debtor sought a judgment sustaining the Debtor's objection to the claim of the Internal Revenue Service ("IRS") and disallowing such claim.  At the conclusion of the evidence, the court granted requests by the parties that they be allowed to file additional briefs in support of their respective positions.  The additional briefs have been filed and have been reviewed by the court.  After reviewing the exhibits, testimony and briefs submitted by the parties and considering the arguments of counsel, the court concludes that the objection should be sustained and the claim should be disallowed as filed.  This memorandum opinion sets forth the reasons for the disallowance of the claim.

A.   Pre-petition Developments

During the years 2004 through 2007, substantial sales of furniture were made to customers located in the United States involving furniture manufactured in China and shipped to the United States by DeCoro Limited ("LTD"), a Hong Kong limited liability company.  The Debtor is a North Carolina corporation and is a wholly owned subsidiary of LTD.  The furniture sales to customers

in the United States were procured through either employees of the Debtor or independent sales representatives engaged by the Debtor.

During 2008 or early 2009, the IRS began an examination regarding the United States tax liability of LTD and the Debtor. The primary question during the examination was which company should pay the income tax due from the furniture sales to customers located in the United States.  In February 2009, the IRS issued "30-day letters" to both the Debtor and LTD.  Debtor Exs. 34, 35; see Trial Tr. vol. 1, 137, Sep. 23, 2013.  In the letter addressed to LTD, the IRS took the position that "LTD earned effectively connected US source income as a result of doing business through its dependent agent, [the Debtor]."  Debtor Ex. 34, at 24 (emphasis supplied).  The IRS labeled this position as its primary position. Id.  This letter did not consider the tax liability of the Debtor; rather it determined the tax liability of LTD pursuant to I.R.C. § 882.  In the letter addressed to the Debtor, on the other hand, the IRS took the position that "adjustments  should be made to the income of [the Debtor because it] consistently reported net operating margins of less than 1% and should be reporting profits comparable to similar, independent distributors."  Debtor Ex. 35, at 24 (emphasis supplied).  The IRS labeled this position as "IE Alternative Issue #1" because it was alternative to the primary position asserted in the letter to LTD.   Id.   The alternative position did not consider the tax liability of LTD under I.R.C. §

882; rather it determined the tax liability of the Debtor pursuant, in part, to I.R.C. § 482.  Neither letter considered the situation in which the Debtor might be determined to be something other than an independent distributor yet was still liable under I.R.C. § 482 for failing to accurately report its true taxable income. Following these letters but prior to any assessment being made by the IRS, LTD filed an insolvency proceeding in Hong Kong and the Debtor filed for bankruptcy relief in this court.  No further action was taken by the IRS prior to filing its proof of claim.

     B.    The Claim filed by the IRS

     The IRS filed a proof of claim on June 8, 2009.    According to the last amendment to the claim which was filed on January 8, 2013, the tax deficiency was determined to be $11,177,940 including $1,814,861 in pre-petition interest.  The claim consists of income taxes concerning the Debtor's 2004 though 2007 tax years, and a withholding obligation for foreign taxes imposed under I.R.C. §§ 1441 and 1442.

     The income tax liability portion of the IRS claim is based on adjustments to the Debtor's income under I.R.C. § 482.  Section 482 allows the IRS to make allocations (a "482 adjustment") among members of a controlled group of taxpayers where a controlled taxpayer has not reported its true taxable income.  The IRS contends that the Debtor was designed to be and functioned as an independent distributor.    The IRS further contends that the

- 3 -

Debtor's true taxable income was much higher than what the Debtor reported from 2004 through 2007. As such, pursuant to section 482, the IRS sought to adjust the Debtor's 2004-2007 income in order to reflect the true taxable income of an independent distributor dealing at arm's length with a manufacturer-supplier. In computing this portion of the claim, the IRS apparently determined what an "arms-length" mark-up rate would be and used that figure in arriving at the income tax liability of the Debtor based on the furniture sales that were made in the United States during the years in question.

The foreign tax liability portion of the IRS claim is based on the Debtor's withholding obligation under I.R.C. §§ 1441 and 1442. According to the IRS, the 482 adjustment in the income tax portion of the claim resulted in a determination that LTD, in effect, received a dividend related to the difference between an arm's length mark-up and the actual, lesser mark-up that was charged. In other words, by not paying the arm's length amount for those services provided by the Debtor, LTD received a dividend equal to that difference. Under section 1441, as made applicable to foreign corporations by section 1442, a foreign taxpayer can be taxed thirty percent of dividends that are not effectively connected with a trade or business in the United States. I.R.C. §§ 1441, 1442. Likewise, 1441 and 1442 provide that anyone who has control, receipt, or custody of such income shall withhold such tax. <u>Id.</u>

- 4 -

Because the Debtor failed to withhold and remit the thirty percent tax, the IRS included the thirty percent amount as part of the tax liability of the Debtor.

C.   The Debtor's Objection to the IRS Claim.

The Debtor objected to the IRS claim, contending that a 482 adjustment is inappropriate because the income reported by the Debtor in its 2004 through 2007 returns clearly and accurately reflects the Debtor's income for those years.  The objection relies on two theories.  The Debtor first asserts that LTD was directly engaged in the furniture sales within the United States and that the Debtor functioned not as a distributor, but rather as a "nexus," "facilitator," "dependent agent," or a "commissionaire" with respect to such sales.  Thus, the Debtor argues that the tax consequences that arose from those sales should be attributed solely to LTD pursuant to I.R.C. § 882.  Alternatively, the Debtor argues that an upward adjustment in income is unwarranted under section 482 because "the Debtor's functions were so limited, and its risks so minimized" that a comparison with comparable businesses reveals that the Debtor was consistently within the range of an arm's length transaction.  See Debtor's Post Trial Br., at 27.

D.   Analysis of the IRS Claim and the Objection by the Debtor

The court is satisfied that the analysis that should be employed arises under section 482 rather than section 882.  While

an application of section 882 in the manner sought by the Debtor
may result in a determination regarding the tax liability of LTD
related to the furniture sales, such an application does not
resolve the question before the court, namely, the tax liability of
the Debtor.   In short, the fact that LTD may have tax liability
does not _ipso_ _facto_ mean that the Debtor has no tax liability.
See, e.g., Inverworld, Inc. v. Comm'r, 71 T.C.M. (CCH) 3231 (1996)
(holding that the parent company was liable for effectively
connected income under I.R.C. § 882 and subsidiary of parent was
also liable for reallocated income pursuant to a 482 adjustment).

The claim before the court is based upon an allocation made by
the IRS pursuant to section 482.   The Debtor filed income tax
returns reporting a specified amount of income for each year during
2004 through 2007.   The IRS, in its claim, has allocated
substantially greater income for each of those years and imposed
additional tax on the basis of the enhanced income figures.   The
IRS did so on the basis of section 482 and therefore that is the
section which the court will focus on and apply in ruling on the
IRS claim.   The Debtor has income tax liability whether it was an
independent distributor as contended by the IRS or merely a nexus
or commissionaire as contended by the Debtor.   Whether the Debtor
was an independent distributor or a mere nexus or commissionaire is
a critical consideration in determining the correct tax liability
and is a matter to be determined in the context of section 482

- 6 -

rather than section 882.

      E.    The Internal Revenue Code and the Treasury Regulations

      i.  Section 482 and Related Regulations

Section 482 provides the IRS with broad authority to allocate income, deductions, credits, or allowances between commonly controlled businesses if it determines it is necessary in order to prevent evasion of taxes or to clearly reflect the income of any of the controlled businesses. I.R.C. § 482.[1] The purpose of section 482 is to prevent artificial shifting of income among controlled businesses by placing a controlled taxpayer on a tax parity with an uncontrolled taxpayer. Comm'r v. First Sec. Bank of Utah, N.A., 405 U.S. 394, 400 (1972); Treas. Reg. § 1.482-1(a)(1) (2013).

The IRS may make a 482 adjustment even in the absence of tax avoidance motives in order to accurately reflect the respective incomes of members of the controlled group. Sundstrand Corp. v. Comm'r, 96 T.C. 226, 353 (1991); Treas. Reg. § 1.482-1(f). Thus, the Treasury Regulations applicable to section 482 ("the

---

    [1] Section 482 specifically provides: "In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes, or clearly to reflect the income of any of such organizations, trades or businesses." I.R.C. § 482.

Regulations") provide that the IRS may adjust income between members of a controlled group if a controlled taxpayer has merely failed to report its "true taxable income." <u>Id.</u> § 1.482-1(a)(2).

The Regulations define "controlled" to include any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable. <u>Id.</u> § 1.482-1(i)(4). It defines a "controlled group" as taxpayers owned or controlled directly by the same interest. <u>Id.</u> § 1.482-1(i)(5). Likewise, a "controlled taxpayer" means "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers." <u>Id.</u> An "uncontrolled taxpayer," on the other hand, means "any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests." <u>Id.</u>

In determining the "true taxable income" of a controlled taxpayer, the standard to be applied is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. <u>Id.</u> § 1.482-1(b)(1). A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances. <u>Id.</u> The process to evaluate whether a controlled taxpayer operated within an arm's length range is colloquially known as "transfer pricing."

ii.  The Transfer Pricing Regulations

- 8 -

As stated previously, "the purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions." Id. § 1.482-1. The true taxable income of a controlled taxpayer is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer ("arm's length standard"). Id. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances ("arm's length result"). Id. The 482 Regulations govern the process to determine the arm's length result ("transfer pricing analysis"). See id. The Internal Revenue Manual identifies three key components to the transfer pricing analysis as set forth in the Regulations:

A. **Best Method Rule**: The best method is the one that provides the most reliable measure of an arm's length result.

B. **Comparability**: Specific factors for determining comparability should be considered in applying and selecting different methods. Differences between controlled transactions and uncontrolled comparables should be adjusted for. Such adjustments will affect the reliability of the methods applied.

C. **Arm's Length Range**: The final regulations recognize that the application of a method may produce a number of results from which a range of reliable results may be derived. At tax will not be subject to adjustment if its results fall within such arm's length range.

IRM § 4.61.3.2(2) (May 1, 2006).

The process for calculating the arm's length result under the 482 Regulations is essentially a four-step process. See Trial Tr. vol. 2, 173-75, Sep. 24, 2013. The first step is to analyze the function and risks of the controlled corporation. Following the functional and risk analysis, the next step involves selecting a set of non-controlled businesses ("comparables") which exhibit comparable functions and risks to the controlled business. Pursuant to the "best method rule" as provided for in the Regulations, the third step is establish the range of arm's length results (the "arm's length range") based on financial data gathered from those comparables. The fourth and final step is to determine whether the controlled transactions fall within that arm's length range. A 482 adjustment is appropriate if the controlled transactions fall outside of that range. The Internal Revenue Manual acknowledges this four step process by stating that "before selecting the best method, [examiners] should complete the following: [1] Functional and risk analysis; [2] Analysis of the relevant economic conditions, contractual terms, and property or services; [3] Search for comparables." IRM § 4.61.3.7(6).

The first step, which is a function and risk analysis of the controlled transactions, is essential in selecting reliable comparables, selecting the best method to measure an arm's length result, and otherwise conducting a successful transfer pricing analysis. The Regulations provide that:

- 10 -

> The relative reliability of a method based on the results
> of transactions between unrelated parties depends on the
> degree of comparability between the controlled
> transaction or taxpayers and the uncontrolled
> comparables, taking into account the facts described in
> § 1.482-1(d)(3) (Factors for determining comparability),
> and after making adjustments for differences, as
> described in § 1.482-1(d)(2) (Standard of comparability).
> As the degree of comparability increases, the number and
> extent of potential differences that could render the
> analysis inaccurate is reduced. . . . An analysis will be
> relatively less reliable, however, as the uncontrolled
> transactions become less comparable to the controlled
> transaction.

Treas. Reg. § 1.482-1(c)(2)(i). The factors for determining comparability include functions; contractual terms; risks; economic conditions; and property or services. Id. § 1.482-1(d)(1). Dr. Meenan, the expert witness for the Debtor, described this first step as the "function and risk analysis" and advised that it is "critical." Trial Tr. vol. 2, at 183. Dr. Meenan explained that:

> Well, of course, in, in this case the related-party
> transaction was involving the exchange of value between
> DeCoro Hong Kong and DeCoro USA and in order to do a
> transfer pricing analysis of that sort I needed to
> understand, first and foremost, what were the relevant
> facts and circumstances relating, relating to this
> transaction, right? Really, what was the value exchanged
> between the parties? What were the risks that USA bore
> versus what Hong Kong bore? What assets were employed by
> the USA and then Hong Kong in, in doing that? That step,
> in general, as described in the U.S. transfer pricing
> rules is called the functional and risk analysis.
>
> So it's to understand, again, what the value is and the
> value creation. Because, ultimately, the goal in a
> transfer pricing study is to determine what the 482
> regulations say are the true taxable income of the, of
> those related parties, right?
>
> . . .

- 11 -

Trial Tr. vol. 2, at 173, 183-84.  Dr. Meenan also testified as to

why an appropriate functional and risk analysis at the outset is so

crucial to the accuracy of a transfer pricing analysis:

> [W]hy is that important in transfer pricing?  Well, the
> profits that third parties would earn are fundamentally
> impacted by the activity they're doing, the risks they
> assume and the assets they employ.
>
> And so, for example, a, all things equal, a company with,
> bearing more risks would be expected to earn higher
> profit than a company that is protected from risks,
> right?  You know, that's a basic tenet of finance.  So
> investors are willing to bear risks, but you must
> compensate them to bear that risk.
>
> Assets employed in the same way.  If a company is capital
> intensive or, or has a lot of fixed assets, for example,
> on its balance sheet, it must earn a profit to be able to
> cover the depreciation and, in general, the investment on
> those, those assets.
>
> So understanding the functions, the risks, and the assets
> are key to develop a, an arm's, you know a reliable,
> right - the standard under 482 is reliability - so a
> reliable arm's length range is fundamentally dependent on
> understanding the functions, risks, and assets.
>
> . . .
>
> So doing a, a very good function analysis and an analysis
> of this sort is critical. . . .

Trial Tr. vol. 2, at 176-77, 183-84.

Once the functions and risks of the controlled group are

determined, the second step in the transfer pricing process is to

identify uncontrolled businesses and transactions which exhibit

similar functional and risk qualities as the controlled

transaction.  <u>See</u> Trial Tr. vol. 2, at 173-75; <u>see</u> <u>also</u> IRM §
4.61.3.7(6).  Since identical transactions can be "rarely located,"
the standard of evaluation is "comparable transactions under
comparable circumstances."  Treas. Reg. § 1.482-1(b)(1), (d)(1).
In other words, an uncontrolled transaction need not be identical
to the controlled transaction, but it "must be sufficiently similar
that it provides a <u>reliable</u> measure of an arm's length result.  If
there are material differences between the controlled and
uncontrolled transactions, adjustments must be made. . . .
[U]nadjusted industry average returns themselves cannot establish
arm's length results."  <u>Id.</u> § 1.482-1(d)(2) (emphasis supplied).

Once the uncontrolled, but otherwise comparable businesses are
identified, the third step in the transfer pricing analysis is to
apply the financials of those comparables to the transfer pricing
method that yields the most reliable arm's length result (the "best
method rule").  Application of the best method may produce a number
of results from which a range of reliable results may be derived;
in such a case, a taxpayer will not be subject to a 482 adjustment
if its results fall within this "arm's length range."  <u>Id.</u> § 1.482-
1(e).

Pursuant to the best method rule, the method to be selected
must, under the facts and circumstances, provide the most reliable

measure of an arm's length result. Id. § 1.482-1(c)(1).[2] Section 1.482-3 of the Regulations governs "controlled transfers of tangible property" and specifies six available methods that may be used to calculate the arm's length result. Id. § 1.482-3(a). The comparable profits method ("CPM") is one of those methods and was chosen originally by the IRS and later by both experts and as the best method in this case. See id.; Trial Tr. vol. 2, at 194, 291-92. The CPM compares the profitability of the taxpayer to the profitability of the companies selected as comparables. See Treas. Reg. § 1.482-5(a)(CPM "evaluates whether the amount charged in a controlled transaction is arm's length based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances").

Under the CPM, profitability is determined by examining objective measures known as "profit level indicators" ("PLI"). Id. A PLI is a "ratio that measures relationships between profits and

---

[2]     There are two primary considerations when selecting the best method. First is the degree of comparability between the controlled and uncontrolled transactions. Those factors were examined during the first step of the transfer pricing analysis and include functions, contractual terms, risks, economic conditions, and property or services. The second consideration when selecting the best method is the quality of the data and assumption used in the analysis. Factors to examine include: (1) completeness and accuracy of data; (2) reliability of assumptions; and (3) sensitivity of results to deficiencies in data and assumptions. See Treas. Reg. § 1.482-1(c). See generally Robert F. Reilly, Using Intercompany Transfer Price Analysis in Bankruptcy Valuations: Part I, 23-1 Am. Bankr. Inst. J. 30, 48 (2004).

costs incurred or resources employed." <u>Id.</u> § 1.482-5(b)(4).  The
numerator of a PLI ratio will always be profit.  Trial Tr. vol. 2,
at 292.  The denominator, however, may be any reliable variable
such as sales, expenses, or assets.  See <u>id.</u>; <u>see</u> <u>also</u> Treas. Reg.
§ 1.482-5(b)(4).  The Regulations provide that any reliable PLI may
be used, however, the Regulations specifically condone financial
ratios (such as the Berry ratio) and rate of return on capital.
Treas. Reg. § 1.482-5(b)(4)(i)-(iii).

The key to a successful transfer pricing is reliability.  In
order to establish a reliable comparison under the CPM, the
denominator of the PLI ratio should be selected based on the "main
value-adding contribution."  Debtor Ex. 37, at 11; Trial Tr. vol.
2, at 204-06.  A transfer pricing analysis prepared by Deloitte on
behalf of the Debtor illustrated this "value-adding" point:

> So, for example, the profits of entities that have as a
> main focus maximizing sales turnover should generally be
> compared under the CPM using a PLI with sales in the
> basis (i.e., profit per dollar of sales).  Or, entities
> that are primarily service providers incur operating
> expenses as a result of their value-adding activities and
> so generally should be compared under the CPM using
> operating expenses in the base of the PLI (i.e., profit
> per dollar of operating expense).  A variety of PLIs can
> be calculated in any given case.  In addition to
> evaluating the main value-adding contribution of the
> controlled entity and potential comparables when
> assessing the reliability of a PLI, factors such as the
> reliability of the available data for the controlled
> entity and the potential uncontrolled comparables and
> other relevant facts and circumstances should be
> assessed.

Debtor Ex. 37, at 11-12.

- 15 -

Dr. Meenan and Dr. Becker separately determined that in light of the facts and circumstances of this case, the "Berry Ratio" was the most reliable PLI. Trial Tr. vol. 2, at 206, 292. But see IRS Ex. H, Form 886A, at 6-7 (originally selecting operating margin instead of the Berry Ratio as the most reliable PLI). The Berry ratio is simply the ratio of a company's gross profits to its operating expenses. In other words, the selected denominator of the Berry ratio is operating expenses. The Debtor contends that the Berry ratio is a reliable PLI where "the main value contribution is reflected in operating expenses and a reliable segmentation of operating expenses from cost of goods can be determined." Debtor Ex. 37, at 12. Based on his functional and risk analysis, Dr. Meenan concluded that the Berry ratio was therefore the most reliable PLI for this case. Trial Tr. vol. 2, at 206. Dr. Meenan testified that the Berry ratio, however, is not an appropriate PLI for distributors (the type of comparable companies relied upon by Dr. Becker) because "a distributor's key value-added activity is selling..." and thus a denominator which contained sales financials would be more reliable than a denominator which contained only operating expenses. Trial Tr. vol. 2, at 206-07. Dr. Meenan observed:

> [T]he GAAP rules allow companies pretty significant discretion in booking categories of costs between operating expense over cost of goods sold.
>
> So ... using a Berry ratio for a distributor has the following problem: We might have two companies. One

- 16 -

> decides to book a category of costs in cost of goods sold. A second one decides to put that same cost in an operating expense and if they're otherwise equal I have two, two different profits, not due to their business, not due to, you know, transfer pricing. It's due to the fact that there's discretion in how a company books costs.
>
> So a, a, Berry ratio is simply not appropriate for distributor company.

Trial Tr. vol. 2, at 207; see Treas. Reg. § 1.482-5(e) example 1 (selecting PLI of operating margin when calculating the arm's length result of uncontrolled, independent distributors).

In order to further enhance the reliability of profitability comparisons under the comparable profits method, "if there are differences between the [controlled taxpayer] and an uncontrolled comparable that would materially affect the profits determined under the relevant profit level indicator, adjustments should be made." Treas. Reg. § 1.482-5(c)(2)(iv) (referring examiner to the comparability provisions of § 1.482-1(d)(2) as analyzed under the function and risk analysis discussed in the first step). Thus, once a reliable PLI is selected, the unadjusted financials for the comparables and controlled parties must be assessed to determine whether any adjustments should be made. Trial Tr. vol. 2, at 207-08; Debtor Ex. 37, at 13-16; Treas. Reg. § 1.482-5(c)(2)(iv). The "standard of comparability", contained in section 1.482-1(d)(2) provides that "if there are material differences between the controlled and uncontrolled transactions, adjustments must be made if the effect of such differences on prices or profit can be

ascertained with sufficient accuracy to improve the reliability of the results."  Treas. Reg. § 1.482-1(d)(2).

After adjusting comparables as required under the standard of comparability, the comparable profits method directs examiners to then apply the adjusted financials of such comparables to the chosen profit level indicator.  As previously noted, both experts selected the Berry ratio as the most reliable profit level indicator in this case.  Accordingly, once the selected comparables are adjusted pursuant to the Regulations, the operating expenses and profits of each comparable are "plugged" into the ratio.  Thus a comparable which had a profit of 100 and operating expenses of 90 would have a Berry ratio of 1.11 (calculated as profits over operating expenses or 100/90).  Applying the financials of each comparable to the Berry ratio yields a range of ratios.  The Regulations provide that in general, the arm's length range will consist of the results of all of the comparables that meet the following conditions: the information on the controlled transaction and the comparables is sufficiently complete that it is likely that all material differences have been identified and an adjustment is made to eliminate the effect of each difference.  Id. § 1.482-1(e)(iii)(A).  However, in order to further increase reliability, the Regulations provide that the range itself may be adjusted.  Id. § 1.482-1(e)(iii)(B).  The Regulations provide that such increase in reliability may be obtained through the use of the

"interquartile range." See id. § 1.482-1(e)(iii)(C) (providing "the interquartile range is the range from the 25th to the 75th percentile of the results derived from the uncontrolled comparables").

Once the arm's length range is established under the best method, the final step under the 482 regulations is to determine whether the reported financials of the controlled taxpayer falls within that interquartile range. As was the case for the uncontrolled comparables, the financial data reported by the controlled taxpayer are likewise "plugged" into the chosen profit level indicator. If the results fall within the arm's length range, a 482 adjustment is unwarranted. Id. § 1.482-1(e); IRM § 4.61.38(2). On the other hand, if the controlled taxpayer's results fall outside the calculated range, a 482 adjustment is appropriate. In such case, an adjustment will ordinarily be to the median of the interquartile range; however, an allocation that adjusts the controlled taxpayer's result to any point within the arm's length range is reasonable under the Regulations. Treas. Reg. § 1.482-1(e)(3).

F.   Application of the foregoing rules to the Federal Tax Claim.

The issues to be addressed are whether the Debtor and LTD were part of a controlled group for the purposes of section 482 and, if so, whether the IRS adjustment to the Debtor's income was arbitrary, capricious or unreasonable.

There is no dispute regarding first issue.  It is undisputed that the Debtor was a wholly-owned subsidiary of LTD, that Luca Ricci was the sole shareholder of LTD, that Mr. Ricci was the sole director of the Debtor and that Mr. Ricci exercised control over both companies.   These facts fully support a finding that the Debtor was a controlled business and therefore subject to section 482.

The remaining issue is whether the 482 adjustment to the Debtor's income was arbitrary, capricious or unreasonable and if it is determined to be unreasonable, whether the Debtor's Objection should be sustained and the claim disallowed.  A 482 adjustment is presumptively correct and the burden of disproving that determination lies with the taxpayer.  See Welch v. Helvering, 290 U.S. 111, 115 (1933).  When an adjustment is made under section 482, the determination must be sustained unless the taxpayer proves that the determination is unreasonable, arbitrary, or capricious. Ballentine Motor Co. v. Comm'r, 321 F.2d 796, 800 (4th Cir. 1953). The burden of proof does not change merely because the Government is a claimant in a bankruptcy case.   Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 21-22 (2000) ("the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it"); In re Moser, 25 Fed. Appx. 161, 163 (4th Cir. 2002) (applying Raleigh to objection by Chapter 11 Debtor to IRS deficiency claim, the court stated "in this Circuit, the Commissioner always has the

burden of persuasion as to the amount and existence of any deficiency. Before the Commissioner is required to carry that burden, however, the taxpayer first must dispense with the so-called presumption of correctness by carrying his own burden and persuading the court by a preponderance of the evidence that the assessment is arbitrary and excessive."). The burden required of the taxpayer is to demonstrate by a preponderance of the evidence that the section 482 allocations made by the IRS are arbitrary, capricious or unreasonable. Eli Lilly & Co. v. Comm'r, 856 F.2d 855 (7th Cir. 1988). In determining whether the allocations are arbitrary, capricious or unreasonable, the methodology employed by the IRS in making the allocations is an important factor to be considered, including whether the transfer pricing procedures set forth in the Treasury Regulations were followed.

Both parties offered evidence bearing on the remaining issue of whether the IRS adjustment to the Debtor's income was arbitrary, capricious or unreasonable. On the first day of testimony, the Debtor offered the testimony of three former employees of the Debtor to describe the actual relationship that existed between the Debtor and LTD and the actual functions and operations of the Debtor. Heath Corso was employed as the Executive Vice President of Sales for the Debtor from 2006 through 2009; Kathy Hannon was employed as a "traffic director/ administrator" for the Debtor from 2001 through 2009; and Joan Tremlett was employed as Sales

Administrator, Director of Operations and Director of Human Resources for the Debtor from 2000 though 2009.  The Debtor also offered the testimony of Michael DuFrayne, the liquidating plan trustee in this case. According to these witnesses, the Debtor was a facilitator of furniture sales that were made directly to the end customers by LTD and not an independent distributor of furniture.

On the second day of trial, the Debtor offered testimony from Dr. Peter Meenan, the Debtor's expert on transfer pricing.  The IRS offered the testimony from its transfer pricing expert Dr. Brian Becker.   These witnesses offered testimony regarding transfer pricing and its impact on the claim asserted by the IRS.

On the 2004 through 2007 corporate tax returns filed by the Debtor, the Debtor reported total taxable income of approximately $1.3 million.  See Debtor Exs. 42, 43, 44, and 45 (hereinafter "Debtor's tax returns").  Based on that income, the Debtor computed its total tax liability over that same period to be approximately $454,000.  Id.  Relying on a 482 adjustment established in its examination of the Debtor in its alternate position, the IRS filed a proof of claim in this case asserting that the Debtor's income and tax liability were under reported.  IRS Amended Proof of Claim No. 3 (Jan. 1, 2013).   The IRS concluded that the true taxable income of the Debtor for the years 2004 through 2007 was approximately $15.2 million.  As such, this $13.9 million shortfall between reported income and the arm's length range necessitated a

482 allocation and ultimately resulted in an income tax deficiency of approximately $4.7 million. The original 482 adjustment as determined by the IRS was based in large part on the IRS's selection of operating margin (operating profit divided by net sales) instead of the Berry ratio, as its profit level indicator. <u>Compare</u> IRS Ex. H, Form 886A, at 6 <u>with</u> IRS Post Trial Br., at 18 <u>and</u> IRS Ex. M, at 19.[3]

---

[3] The examination letter provided that "[t]he Berry ratio was not selected as a potential profit level indicator ... [because] there has been considerable research and discussion regarding the application of the Berry ratio in such distributor companies. The summary of this research is that the Berry ratio is not a reliable profit level indicator when there is incongruence between the tested party and the comparable companies with relation to the [selling, general and administrative] expenses to sales ratios... [Here] since the SG&A expense to sales ratio for DeCoro USA is 7% while the SG&A to sales ratios for the comparables range from 14% to 26%, the examiner rejected the use of the Berry ratio for this taxpayer since it would produce an unreliable result. <u>In fact, actual application of the Berry ratio in this case does in fact produce a result significantly lower than the application of the operating margin.</u>" IRS Ex. H, Form 886A, at 6-7 (emphasis added). Dr. Becker, on the other hand, chose the Berry ratio as the most reliable profit level indicator. IRS Ex. M, Dr. Becker's Report, at 19 ("economists have devised and applied the Berry ratio (gross profit / operating expenses) as a means to compare companies with different levels of operations within a supply chain."). When presented with this apparent incongruity, the IRS now appears to have adopted the Berry ratio as the most reliable profit level indicator. IRS Post Trial Br., at 18 ("While Dr. Becker and Dr. Meenan used a Berry Ratio in their computations, the IRS used operating margin as a profit level indicator. Dr. Becker testified that the use of operating margin overstates DeCoro USA's profit because unlike the Berry Ratio which focuses on operating expenses, operating margin derives profitability from sales, to which DeCoro USA posted high numbers (almost $600 million). As Dr. Becker stated, just a few percentage points of these sales equates to high levels of profit. Because the Berry Ratio focuses on operating expenses, it is a more conservative and appropriate indicator in this case.") (citations omitted). Notably, the IRS fails to

While the IRS chose operating margin as the most reliable profit level indicator, its expert, Dr. Becker, chose the Berry ratio.  As anticipated in the IRS examination letter, Dr. Becker's arm's length range was significantly less than what the IRS had claimed in the proof of claim.  Using the Berry ratio and a set of independent distributors as his comparables, Dr. Becker computed the interquartile range of the arm's length profit to be between $3.1 million and $13.4 million with the median of $7.9 million. IRS Ex. M, Dr. Becker's Report, at 19-20.  Dr. Becker thus concluded that the Debtor's true income was approximately $6.6 million more than what the Debtor reported on its tax returns.  Dr. Becker did not determine the corporate income tax liability on such an allocation, however, the court finds the corporate income tax liability on $6.6 million taxable income to be less than $2.5 million.[4]  Dr. Meenan likewise chose the Berry ratio as his profit level indicator.  Unlike the IRS or Dr. Becker however, Dr. Meenan selected a group of comparables exhibiting the qualities of freight forwarders as opposed to independent distributors who bought and resold goods.  Dr. Meenan determined that the Debtor's reported

---

explain this reversal other than merely adopting the "more conservative" approach.

[4]This conservative number is based on a simple calculation without regards to progressive tax rates.  The court simply applied a flat 35% rate to each of the 6.6 million dollars.  Such calculation yields a tax liability of $2.31 million.

income of $1.3 million fell within the arm's length range and therefore a 482 adjustment was unwarranted.

The adjustment giving rise to the IRS claim is based upon the proposition that the Debtor was an independent distributor engaged in the business of purchasing furniture from LTD and reselling it to customers within the United States and that the Debtor's income should be adjusted to a level comparable to that of such a business. Because the IRS and its expert failed to properly assess the actual functions and risks of the Debtor's business, the analysis relied by the IRS was flawed and the adjustment stemming from that flawed analysis was unreasonable and cannot be upheld.

As the Regulations make clear and as Dr. Meenan emphasized, the quality of a transfer pricing analysis depends upon the selection of reliable comparables, i.e., unrelated entities which exhibit similar functional and risk qualities as those involved in the controlled transaction. In order to be in a position to select reliable comparables, a witness must have a correct understanding of the nature of the controlled company's business and the functions and risks associated with that company and the transactions at issue. In this case, the IRS's expert, Dr. Becker, selected comparables that do not exhibit similar functional and risk qualities to those of the Debtor and the transactions at issue. The comparable companies selected and relied upon by Dr. Becker in his transfer pricing analysis were companies engaged as

distributors in the business of buying and reselling goods of various kinds. As reflected by the evidence, the Debtor's business and the functions and risks related to the Debtor's business are much different than assumed by Dr. Becker.

Dr. Becker apparently relied entirely upon written documents that were supplied to him in attempting to analyze the Debtors' functions and risks. The evidence offered by the Debtor establishes that those documents do not accurately reflect the manner in which the Debtor actually operated nor the risks and functions related to the Debtor's actual business operations. As a result, Dr. Becker failed to examine and consider the true substance of the of the transactions at issue.

On cross examination, the Debtor asked Dr. Becker whether, at the outset of his transfer pricing analysis, he specifically determined whether the Debtor was in fact a distributor or was something else more akin to a commissionaire. Dr. Becker testified that "no, I did not specifically deal with whether [the Debtor was] a distributor or not." Trial Tr. vol. 2, at 308. A review of his report reveals similar assumptions. His report states: "In particular, I compare [the Debtor's] Berry ratios of that of comparable independent distributors." IRS Ex. M, at 5. When questioned whether he conducted a formal functional and risk analysis, Dr. Becker testified that "I think my report does that formal analysis." Trial Tr. vol. 2, at 309. However, the report

- 26 -

simply concluded without apparent examination that:

> [The Debtor] acted as a reseller of DeCoro products primarily using (unrelated) commissioned sales representatives in the United States who received commissions ranging from two to four percent of sales. [The Debtor] took <u>title</u> to the product before it was sent to the customers, but the <u>physical</u> products were shipped directly from Asia to U.S. customers. . . . [the Debtor] took title to the inventory while in transit. While [the Debtor] did not warehouse inventory, it facilitated the importation of the furniture through its logistics office located in Atlanta.

IRS Ex. M, at 8.

It is clear many of the comparables selected and relied upon by Dr. Becker were vastly different from the Debtor. Dr. Becker's report contained brief excerpts taken from the respective "Form 10-K" for each comparable.  <u>See</u> IRS Ex. M, at C6. The Form 10-K's themselves were not offered into evidence.  The cross examination of Dr. Becker revealed that his familiarity with the comparables referred to in his report was very limited.  Generally, when questioned about the specifics of any given comparable, Dr. Becker responded with "I don't know" or "I'll take your word for it. I don't recall."  Trial Tr. vol. 2, at 339-40.  However, Dr. Becker was able to recall a few important details regarding those comparables.  Whereas the Debtor did not maintain an inventory, Dr. Becker testified that each of his selected comparables maintained an inventory of products and in some instances a very substantial inventory.  Trial Tr. vol. 2, at 334.  Furthermore, Dr. Becker recalled that none of the comparable companies had a single, sole source provider of goods as was the case with the Debtor and LTD.

- 27 -

Trial Tr. vol. 2, at 335.  The limited information that is included in Dr. Becker's report does reveal very significant differences between the Debtor and the purported comparable.   Bluelinx Holdings, Inc., for instance, is described as "the leading distributor of building products in the United States" who "distributed more than 10,000 products to approximately 11,500 customers through our network of more than 80 warehouses and third-party operated warehouses."  IRS Ex. M, at C6.  Notably, the Debtor in this case had one line of products and did not have a single warehouse.  Another purported comparable, United Stationers, Inc., had a "network of 70 distribution centers."  IRS Ex. M, at C10. The Debtor, of course, had no distribution centers.  Dr. Becker was asked about how a transfer pricing analysis might be affected by a failure to first assess the subject company's risks and functions. Dr. Becker replied "I guess if the facts in any case were to change, a good economist . . . would have to re-analyze the entire case and think about it and I don't know how that would shake out." Trial Tr. vol. 2, at 333.  While the facts of this case have not changed, they are much different than assumed by Dr. Becker.  And while Dr. Becker does not commit to how a different fact pattern "would shake out" it is clear from his answer that if the facts are different from described in this report, a re-analysis would be required in order to make a reliable transfer pricing analysis.

An example of the documents relied upon by Dr. Becker and the

IRS is the "Intercompany Distribution Agreement" ("IDA") between the Debtor and LTD.  The IDA is the document perhaps most heavily relied upon by the IRS and Dr. Becker in arguing that the Debtor was an independent distributor who purchased and resold furniture. The IDA was executed in 2002 and thus was in effect during 2004 through 2007, the period at issue in this litigation.  The IDA described LTD as being in the business of designing, manufacturing, marketing and selling leather furniture "acting as the United States distributor of Products for [LTD]."  Debtor Ex. 2, at 1. The IDA further provided that the Debtor would establish prices and discounts for the furniture the Debtor sold to the customers within the United States (the "end customers").  According to the IDA, upon receipt of an order from the end customer, the Debtor would place that identical order with LTD.  The IDA provided that LTD would deliver the furniture to the Debtor to the location designated by the Debtor and that risk of loss and title to the furniture would pass to the Debtor in accordance with the delivery terms set forth in the purchase orders.  According to the IDA, the Debtor was to invoice the end customer.  Within 30 days after the date when the Debtor received money from the end customer, the Debtor would pay LTD for the goods the Debtor purportedly purchased from LTD.  The IDA also provided that the cost of goods sold would equal the price invoiced to the end customer plus any related charges that were not included in such invoiced price reduced by

any discounts given to the customer.  The Debtor was required under the IDA to remit all of its "sales revenue" back to LTD as the cost of goods sold.  Since this left the Debtor with no means for paying its expenses, the IDA contained a "Reimbursement and Compensation" provision which provided that LTD would pay for all of the expenses that the Debtor incurred, including wages and commissions owed to an "independent" sales staff engaged by the Debtor.  In addition to LTD paying the Debtor's expenses, the IDA provided that LTD would pay the Debtor an additional sum equal to ten percent of total operating expenses less the amount paid to the independent sales representatives and the amount of any uncollected accounts receivables.  According to the IDA, the purpose of these reimbursement and compensation provisions was so that the Debtor "would not face or bear any risk as to the non-saleability of any Products or for any bad debts."  Debtor Ex. 2, at 6.  The IDA additionally contained an indemnity provision wherein LTD would indemnify and defend the Debtor against any liability or action arising out of any product purchased from LTD.  The IDA provided that LTD and the Debtor were independent parties and that nothing in the IDA would be construed to make either party an agent of the other party.  It also specified that "except as otherwise provided in this Agreement, neither party will either have nor represent itself to have any authority to bind the other party or act on its behalf."  Debtor Ex. 2, at 7.  These appear to be the primary

- 30 -

provisions relied upon by the IRS in contending that the Debtor was an independent distributor engaged in the business of buying furniture from LTD and reselling the furniture to end customers.

While the IDA may provide some indication of the functions of the Debtor and the nature of the controlled transactions, the court should respect only those terms that are consistent with the economic substance of the underlying transactions, <u>i.e.</u>, consistent with how the Debtor actually operated.   In that regard, the Regulations provide:

> The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions. In evaluating economic substance, greatest weight will be given to the actual conduct of the parties. . . . If the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.

Treas. Reg. § 1.482-1(d)(3)(B)(1).

The provisions of the IDA are not consistent with the economic substance of the transactions at issue.   The relationship between the Debtor and LTD and the manner in which the Debtor actually conducted business were vastly different than portrayed in the IDA. According to the evidence, the economic substance of the Debtor's relationship with LTD and the Debtor's actual operations, the Debtor was neither independent nor a distributor that bought and sold furniture.   Instead, the evidence showed that the Debtor

- 31 -

existed and functioned to facilitate sales that were made within the United States by LTD directly to end customers.  That reality, and not the fictitious business model described in the IDA is the proper basis for evaluating whether the Debtor's income should be adjusted under section 482.

Although the IDA speaks in terms of  LTD selling furniture to the Debtor, the reality of the transactions between the Debtor and LTD is that the sales by LTD were not to the Debtor.  Under the Uniform Commercial Code, a "sale" consists in the passing of title from the seller to the buyer for a price.  See, e.g., N.C. Gen. Stat. § 25-2-106(1)(2013).  This means that in order for the Debtor to have been a distributor that brought and then resold furniture as asserted by the IRS, a transfer of title from LTD to the Debtor was required.  The IDA provides that "title to the Products shall transfer to USA at the time risk of loss or damage so transfers." Debtor Ex. 2, at 5.  According to the evidence, there was never a transfer of title to the Debtor because the risk of loss or damage never transferred to the Debtor.  Read in its entirety, the IDA itself reflected that the risk of loss remained with LTD until the furniture was delivered to the end customer.  Thus, under the reimbursement provisions of the IDA, LTD was obligated to advance to the Debtor the funds required "to pay for all of the expenses USA incurs in the operation of its business. . . ."  Under this language, any loss or expense related to the furniture shipped by

LTD, in actuality remained with LTD until the furniture was delivered to the customer since any such loss or expense ultimately fell on LTD. Moreover, the testimony of Kathy Hannon established that delivery of the furniture was directly from LTD to the end customer and that risk of loss never transferred to the Debtor. Ms. Hannon was the employee of the Debtor who dealt first hand with the processing of the furniture once it arrived in the United States. Ms. Hannon testified that:

> [T]he way the operation was set up was that the Incoterm DDP means delivered duty paid to named destination, the named destination being a very integral party of that statement, is that everything was sold up to the closest rail ramp or port. If a customer was in [Los Angeles], obviously we'd stop at the [Los Angeles] Port. If a customer was in Boston, it would go via Boston or New York Port. It was routed to the best physical rail ramp or port to the customer's warehouse facility.

> Once the cargo arrived and Hugh cleared it through Customs, title was then immediately transferred to the customer. The customer then had the decision, Do you want to send your own trucker? Who are you – who's your trucker? Who's going to pick up the container from the port or the rail? Or, if you want, [the Debtor] can provide that service for you and [the Debtor will] bill you later for the trucking.

Trial Tr. vol. 1, at 85.

To illustrate further that title did not pass to the Debtor when the furniture arrived in the United States, Mr. Corso described a situation that occurred in 2009 regarding furniture that had arrived in the United States:

> Basically, what had happened is at this point in time, in January of 2009, Luca abandoned the factory in China and fled the country and in the U.S. we were trying to conclude business in a professional manner and to take

- 33 -

care of as many people as possible.  One of the issues
that we faced was that the containers on the water, we
still had customers that wanted the product, but because
the parent company had title to the containers we
couldn't take possession of them.  And the shipping
companies had indicated that the parent company was past
due on paying their invoices, but not only did we have to
pay the past due invoices we didn't have legal grounds
to take possession unless an officer of the parent company
would give a written document stating that they authorize
us to do so . . . . [LTD] had title to the goods.  We
didn't have a legal basis to take possession of the
goods.

Trial Tr. vol. 1, at 57-58.

Based upon his familiarity with the Debtor's business, Michael

DuFrayne, the liquidating plan trustee, also testified without

objection that the Debtor did not take title to the furniture that

was shipped to the United States by LTD.  Mr. DuFrayne obtained and

reviewed the business records of the Debtor and, of course, heard

the testimony regarding the Debtor's mode of business.  In reaching

this conclusion, Mr. DeFrayne also took into account the statements

made by the IRS in its "30-day" letter addressed to LTD.  Trial Tr.

vol. 1, at 139.  This letter stated the primary position of the IRS

in its claim against LTD in which the IRS concluded that the Debtor

did not take title to the furniture.[5]

---

[5]At that time the IRS described the Debtor as being a
"commissionaire" stating "[i]n a commissionaire agreement the
commissionaire is the representative of the principal in its local
market.  The commissionaire enters into a contract for sale with
the customer issuing an invoice in its own name and legal title for
the goods passes from the principal to the customer even though the
goods may physically flow through the commissionaire and the
commissionaire receives a commission for its efforts.  The
commissionaire is therefore acting in its own name, on behalf of

Contrary to the terms of the IDA, the independence that would be found with a true distributor engaged in the buying and selling of a product for a profit did not exist on the part of the Debtor. The testimony of Heath Corso highlighted the vast difference between the Debtor's actual operations and relationship with LTD and what is portrayed in the IDA. His testimony and the testimony of the other former employees of the Debtor showed that the Debtor had little, if any, discretion related to the sale of furniture such as setting prices, accepting offers from end customers, and hiring and firing with respect to the sales staff. These were all matters firmly controlled by LTD.

The testimony of Mr. Corso and the other former employees of the Debtor established that the Debtor had no autonomy or independence and effectively no discretion regarding matters related to the furniture sales. Instead, LTD maintained near absolute control over all aspects of the furniture sales. Contrary to the terms of the IDA, only LTD could establish prices for the furniture, and only LTD could approve discounted terms to customers. Contrary to the IDA provisions, LTD maintained total

-----

the risk of the principal. The products remain the property of the principal until they pass to the customer. Nearly all risk is retained with the principal. As a result, the principal can justify a low profit margin for the commissionaire."

Debtor Ex. 34, at 39.

control over all customer orders: LTD established credit criteria; LTD exclusively controlled whether to accept or reject every order submitted from the customer[6]; and only LTD had discretion and authority to approve <u>any</u> modification to orders after acceptance. LTD also exercised exclusive control over all product claims and warranty issues that arose with respect to the furniture sales.

LTD also controlled every aspect of the Debtor's finances. The Debtor had no beneficial access to payments that were made by the customers who purchased furniture.  Although the payments came to the Debtor, the Debtor was required to deposit the entire amount of such payments into a bank account that LTD required the Debtor to establish.  The entire amounts received from customers were then <u>immediately</u> transmitted from that account to LTD.  The Debtor was not permitted to utilize or access any of the deposits.  Basically, the only funds that the Debtor had access to were funds transmitted back to the Debtor by LTD to cover the Debtor's expenses.  All purchases by the Debtor in excess of $3,000 had to be expressly approved by LTD and at one point the Debtor was even required by LTD to obtain LTD's authorization before granting an end customer's request for a "$20 repair."

LTD also exercised a significant degree of control over the sales representatives involved in selling the furniture shipped to

---

[6]  The Debtor merely served as a conduit: it received customer orders and sent it directly to LTD which would determine whether to accept or reject such order.

the United States.  As reflected by the testimony of Mr. Corso, LTD frequently bypassed the Debtor and had direct communications with the sales representatives regarding product issues or questions regarding orders obtained by the sales representatives.  At the behest of LTD, the sales representatives sometimes would communicate orders directly to LTD without involving the Debtor. LTD determined any issues that arose regarding the compensation to be paid to the sales representatives and also had sole discretion on whether to terminate a sales representative.

In summary, few of the provisions in the IDA were consistent with the functions actually performed by the Debtor or with its actual relationship with LTD.  The reliance placed upon the IDA by the IRS and Dr. Becker in arguing that the Debtor functioned as an independent distributor engaged in buying and reselling furniture therefore was misplaced and unreasonable.

A further illustration that the Debtor was not a distributor that functioned in the manner attributed by the IRS and its expert is that, unlike an independent distributor, the Debtor had little, if any, opportunity to realize a profit from the furniture sales. In practice and under the IDA, the Debtor's cost of goods was exactly the same as the amount for which the furniture was sold to the end customer. There was no profit margin for the Debtor.  While the IDA provided for a small commission related to the Debtor's expenses to be paid by LTD, in actuality the commission was paid

infrequently and when it was paid, the Debtor was required to immediately remit or refund the commission back to LTD. Basically, the Debtor's business boiled down to operating at best on a breakeven basis, which is not the manner in which an independent business actually engaged in the business of buying and selling goods would operate.

A further lack of comparability between the Debtor's actual business and the IRS's unrealistic view of the Debtor's business as being a distributor engaged in buying and reselling furniture is that the Debtor had none of the risks associated with such a business. The IDA itself provided in the "Reimbursement and Compensation" provision that the intent was that the Debtor "shall not face or bear any risk as to the non-saleability of any Products or for any bad debts." Debtor Ex. 2, at 6. The IDA also contained an expansive indemnity provision which included an obligation on the part of LTD to indemnify the Debtor from any liability from any product purchased from LTD or from any liability provided by law with respect to any product. Absent then was any risk to the Debtor that furniture might be damaged in shipment, or if proven defective, that an end customer might reject furniture or fail to pay for the furniture; nor was there any risk that expenses might increase faster than prices could be increased, or any of the other myriad of risks that are inherent in conducting the type of business attributed to the Debtor by the IRS and its expert.

Moreover, the Debtor's business did not require the type of capital expenditures required of an independent distributor and which would have to be reflected in the prices charged by such a business. The Debtor did not carry an inventory of furniture nor distribute the furniture. Thus, unlike the comparables relied upon by the IRS, the Debtor did not incur the cost of acquiring and maintaining inventory, delivery vehicles or warehouses. The IDA provided that LTD would deliver the furniture either to the Debtor or to an end customer designated by the Debtor; however in reality, orders were always shipped and delivered directly to the end customer. The Debtor's only role was to serve as a "layer of protection for [LTD] . . . if need be, [the Debtor] could retain control of the cargo rather than, for them to protect them for exorbitant charges that could incur here in the U.S. by abandoned cargo." Trial Tr. vol. 1, at 84. When a sale "went bad on the water," i.e., after furniture was shipped, the end customer became unable or unwilling to purchase the furniture shipped from Hong Kong, the Debtor did not have the authority to "do a manifest corrector with the steamship line to reroute it." Trial Tr. vol. 1, at 84. Rather, LTD continued to exercise exclusive authority to change the bill of landing, port of lading, port of discharge, or rail ramp location. In those cases, the Debtor would only ensure that the Customs filings were updated and in rare cases find a location to temporarily store non-accepted furniture. In

accordance with the IDA, LTD would reimburse the Debtor for all expenses including those incurred when sales went bad on the water.

Based upon the foregoing, the court concludes that the Debtor has overcome the presumption of correctness that existed with respect to the allocation of income made by the IRS pursuant to the 482 adjustment and the additional income taxes assessed by the IRS. The Debtor did so by establishing by a preponderance of the evidence that the IRS's allocation of income pursuant to section 482 was based upon a flawed analysis that did not comply with the IRS's own regulations and was thus unreasonable. Upon the Debtor overcoming the presumption of correctness, the IRS had the burden of persuading the court that its allocation and claim for additional income tax were correct, which the IRS failed to do. The court therefore will sustain the Debtor's objection to additional income tax included in the IRS's proof of claim.

The remaining portion of the claim involves the foreign tax that was assessed by the IRS. It appears that the IRS relies upon the withholding requirement of I.R.C. §§ 1441 and 1442 in claiming the foreign tax. Sections 1441 and 1442 require that all persons having the control, receipt, custody, disposal, or payment of any "dividends" (to the extent that the dividends constitute gross income from sources within the United States) of any foreign corporation shall withhold from such a flat 30 percent tax on that dividend income. I.R.C. §§ 1441 and 1442. The IRS contends that

its 482 adjustment to the Debtor resulted in a deemed dividend to LTD and thus sections 1441 and 1442 would be triggered, requiring the Debtor to withhold 30 percent of that dividend.  The foreign tax thus is dependent upon the validity and correctness of the allocation made under section 482.  The failure of the IRS to uphold the 482 adjustment means that there is no basis for claiming the foreign tax since, without the 482 allocation, a dividend cannot be attributed to LTD and without a dividend there was no withholding requirement on the part of the Debtor.  Accordingly, the Debtor's objection likewise will be sustained as to the foreign tax included in the claim.

An order sustaining the Debtor's objection and disallowing the amended claim filed by the IRS is being entered contemporaneously with the filing of this memorandum opinion.

This 18th day of March, 2014.

_William L. Stocks_
WILLIAM L. STOCKS
United States Bankruptcy Judge